PAULINE BERENSON, administratrix, *vs.* FRANK BUTCHER & another, executors, & others.

Suffolk. March 30, 1911. — May 19, 1911.

Present: KNOWLTON, C. J., MORTON, HAMMOND, BRALEY, & RUGG, JJ.

*Negligence. Animal. Joint Tortfeasors.*

In an action by an administrator to recover from the employer of his intestate for the conscious suffering of the intestate from injuries caused by the running away of a vicious horse of the defendant while the intestate was in the wagon to which the horse was attached, in consequence of which the intestate jumped from the wagon and sustained the injuries sued for, if there is evidence on which it could be found that the horse was vicious and that the defendant knew it, that the intestate was in the defendant's employ and that the horse was furnished to the intestate by the defendant to be used in the defendant's business, that the intestate did not know that the horse was vicious and that the defendant gave him no warning or information as to the character of the horse, when such warning or information would have prevented the accident, the case is for the jury, and it is for the jury to say whether, taking all the circumstances into account, the intestate was in the exercise of due care or voluntarily assumed the risk of injury in jumping from the wagon as he did.

In an action against the plaintiff's employer for personal injuries caused by the running away of a vicious horse of the defendant while the plaintiff and another employee of the defendant were in the wagon to which the horse was attached, if there is evidence that the defendant knew that the horse was vicious and that the plaintiff did not, and that the defendant was negligent in furnishing the horse to the plaintiff and in giving him no warning or information as to the horse's dangerous character, it is no defense that just before the horse ran away the plaintiff's fellow employee had taken off the horse's bridle for the purpose of feeding him on the road, for, even if the fellow servant knew that it was dangerous to attempt to feed the horse on the road by taking off the bridle and his negligence contributed to the accident, this merely would make the fellow servant a joint tortfeasor and would not relieve the defendant from liability if the jury found against him.

TORT by the administratrix of the estate of Thomas B. Berenson, to recover damages for the conscious suffering of the plaintiff's intestate caused by injuries received from the running away of a horse belonging to the defendants, copartners doing business under the firm name of the Bay State Company, on August 21, 1906, in the town of Cochituate.     Writ dated October 18, 1906.

In the Superior Court the case was tried before *Harris*, J., in January, 1911.   The plaintiff's intestate, who was her husband, died on August 25, 1906.   William R. Brereton, one of the defendants, died in December, 1906.   Martin Butcher, another of the defendants, died on January 30, 1910.   It was undisputed that on August 21, 1906, the plaintiff's intestate was in the employ of the defendants as a salesman and agent; that employed with him was one Appleton, who died after the action was brought; that together on the day in question they had a horse furnished by the defendants.   It also was undisputed that the plaintiff's intestate was taken to a hospital in Natick, where he died on August 25, 1906; and for the purposes of this case it was admitted that he consciously suffered from the effect of the injuries received in the runaway.   It appeared from the records of the hospital, dated Natick, August 21, 1906, that the intestate described his employment as " teamster for Bay State Company."

The plaintiff testified on direct examination as follows: That she saw her husband the next day after the accident; that he was perfectly conscious; that " he told me that he was in the back of the team, fixing the merchandise, while Mr. Appleton was putting the feed bag on the horse, when the horse went

wild, and he didn't know whether he was going to be dashed to pieces. There was a post in front of him, and he jumped to save his life "; that " he told me that he wished he had known the horse was a vicious horse. He never would have travelled with him; never worked with him "; that that conversation was on Wednesday after the accident; that she saw her husband again the following day; that he then told her the same thing; that before her husband's death she went to see the defendant Brereton; that she talked with him about her husband's injury and about the horse and that they had the following conversation: "I went in to him and I asked him — I wanted to see Mr. Brereton. He said, 'Right here.' I told him my name was Mrs. Berenson. He told me he was very sorry the case happened, and he snapped his fingers. He said, 'Too bad! Too bad! I told Mr. Butcher to get rid of the horse.' He says, 'Since Mr. Weinberg (a gentleman by the name of Weinberg) got run away with, the horse ran away with him, something to that effect. I can't remember — we must get rid of the horse. It is too bad'; and he snapped his fingers like this (illustrating). He told me he will aid me all he can, and to come on a Monday and see him. My husband died on a Saturday previous "; that her husband told her on the Thursday after the accident that " they were supposed to feed the horse on the road where there was no nearby stable, they could feed them out, and that was the orders, that was the reason he got hurt and that is how he got hurt, the horse started up with him."

One Arthur Berenson, called as a witness for the plaintiff, testified on direct examination that the day after the accident he saw the intestate at the hospital and that the intestate's statements to him were in substance as follows: " In substance he said to me that he was at work for this Bay State Company, and I asked him how long he had been at work for that company, and he said a short while. He said that he had this horse and was working on the team with Mr. Appleton. They were selling, I think he told me, chairs, at the time, for the Appleton Company — for the Bay State Company, and that he was inside the team. That is, he was on the team, with his back toward the horse, doing something. It was in Cochituate, about noon time. They were getting ready — they had stopped there, get-

ting ready to feed the horse. He was in the team; I think he told me back of the chair. Mr. Appleton was getting ready to feed the horse, and suddenly he felt a movement of the team, and he saw — turned around and saw the horse [was] going to run away, or was in the act of running away, and to save himself, he jumped from the team. As he did so, he landed on one foot. I have forgotten which it was now, the right or the left foot, and that his foot went from under him, and he felt something snap, hard."

There was much other testimony, the result of which is mentioned in the opinion.

At the close of the evidence, the defendants asked the judge to rule that upon the law and all the evidence the plaintiff was not entitled to recover. The judge refused to make this ruling, and the defendants excepted. The defendants then asked, among others, for the following rulings:

" 3. The removal of the bridle from the horse in a public street was of itself negligence and a lack of due care, and is a bar to the plaintiff's recovery.

" 4. If the conduct of Appleton in the care and management of the horse contributed in causing the horse to get away, the plaintiff cannot recover."

" 6. If Appleton removed the bridle without giving warning to Berenson, then the accident was caused by the negligence of Appleton for which the defendants are not liable.

" 7. If the intestate knew that Appleton was about to remove the bridle from the horse, it was a lack of due care on his part to have remained in the wagon, and the plaintiff cannot recover."

" 12. If the ordinary everyday way of baiting the horse was the removal of the bridle, and while such bridle was being removed it might be reasonably expected that the horse might get away, the dangers attendant upon such removal and baiting and the getting away of the horse were assumed by the plaintiff's intestate."

The judge refused to make any of these rulings. The defendants excepted to their refusal, and the judge submitted the case to the jury under instructions not otherwise excepted to. The jury returned a verdict for the plaintiff in the sum of $3,000; and the defendants alleged exceptions.

*N. N. Jones,* for the defendants.

*F. P. Garland,* (*A. Berenson* with him,) for the plaintiff.

MORTON J. There was evidence tending to show that the horse was vicious and was known to the defendants to be so. It could have been found that the horse had run away at least twice before while the defendants had it, under circumstances similar to those in this case; that it was nervous and liable to jump; and that the stableman had had to hold it for men to get into the team. One of the witnesses testified, without objection, that he was afraid of it, and another, with whom the horse ran away, testified that he told the defendant Brereton, since deceased, that he had run away and he wanted to change it. The same witness also testified that he did not regard the horse as safe. In addition to this the administratrix, the widow of the deceased, testified that in an interview with Brereton after the accident he spoke of the horse as " a bad horse ; a crazy horse "; and said that he had told the defendant Butcher, also since deceased, that they " ought to get rid of the horse." This evidence warranted a finding that the horse was vicious and that the defendants knew it. It was undisputed that the plaintiff's intestate was in the employ of the defendants and that the horse was furnished to him by them to be used in their business. There was evidence tending to show that he did not know that the horse was vicious and that the defendants gave him no warning or information as to the character of the horse. Their failure to do so could have been found to constitute negligence on their part (*Lynch* v. *Richardson,* 163 Mass. 160), and to have been the proximate cause of the accident. Whether, taking all of the circumstances into account, the deceased was in the exercise of due care, and whether he assumed the risk of jumping from the wagon as he did were plainly questions for the jury. *Warren* v. *Boston & Maine Railroad,* 163 Mass. 484. *Nisbet* v. *Wells,* 25 Ky. Law Rep. 511. There was nothing to show that Appleton knew that it was dangerous to attempt to feed the horse on the road by taking the bridle off, and, even if he did know it and his negligence contributed to the accident, the defendants would not be relieved thereby. It would be simply a case of joint tortfeasors.

*Exceptions overruled.*